[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
Plaintiff, PDS Engineering Construction, Inc. (hereinafter PDS) brings this action to foreclose its mechanic's lien placed on property of defendant Double RS Partnership (hereinafter Double RS) located on CT Page 10307 the Berlin Turnpike in Wethersfield and Newington. United Bank and Trust Company (now known as Fleet Bank but hereinafter referred to as United Bank) is cited as a defendant by reason of a mortgage it placed on the property claimed to be subsequent in right to PDS' lien. Plaintiff moved to determine the order of priorities of the several parties to this action. The court agreed to hear that motion together with the merits of the case and to render a final judgment.
Necessarily implicated are an interpretation of key provisions of the Connecticut's mechanic's lien statute, Conn. Gen. Stats. 49-33 et. seq. and its constitutionality in light of the factual pattern of the case.
The court finds the following facts: Plaintiff PDS, at the times relevant herein, was engaged in the business of designing and constructing industrial and commercial buildings. Defendant Double RS was engaged in the business of developing and owning such buildings. Mr. Joseph Russo, a partner of Double RS, contacted Mr. Frank Borawski, president of PDS, in October 1988 for the purpose of having Borawski review certain preliminary plans for the construction of a strip plaza, consisting of retail commercial and office space on Berlin Turnpike land on which Double RS had an option. After PDS reviewed the plans, Russo asked PDS to prepare revised design and engineering drawings and to assist Double RS in obtaining all necessary building permits and approvals. PDS submitted a price of $1,120,000 for the design and construction of the strip plaza which was accepted by Double RS. They agreed PDS could start construction after all building permits were obtained from Newington and Wethersfield. Beginning in November 1988 PDS undertook design and engineering services directed to preparing final building drawings and plans. On March 9, 1989 Double RS took title to the property and the towns of Newington and Wethersfield issued building permits. Immediately thereafter PDS hired subcontractors who did the following work on the building site: established building corners, laid out storm drain lines and catch basins, cut brush, flagged trees for removal, made test borings and soil tests, delivered and spread fill with excavation equipment, and installed a silt fence.
On March 27, 1989 PDS and Double RS memorialized their earlier oral agreement by a written contract on a form of the American Institute of Architects. In that contract PDS was identified as architect and contractor and agreed to construct a retail building and do associated site work for the price of $1,120,000, work to commence on receipt of CT Page 10308 a building permit, which had been already obtained.
At that time Double RS was negotiating with United Bank for a construction mortgage. Attorney Jacek Smigelski, counsel for the bank, contacted Borawski of PDS several days before the closing and asked him to sign a collateral assignment of contract rights. In the bank's file at that time were the building permits and the contract between PDS and Double RS. Smigelski never asked Borawski to sign a lien waiver and none was ever signed by PDS. The mortgage closing took place on April 13, 1989. A mortgage deed in the amount of $1,750,000 by Double RS to United Bank and a collateral assignment of leases and rentals were executed and recorded on that date on the land records of Wethersfield and Newington.
The bank admitted in response to plaintiff's request for admission that it "had knowledge, information or belief that labor had been performed or material had been furnished in connection with the construction of the Project prior to the recording of the Note and the Mortgage."
PDS proceeded with construction of the building and was paid as work progressed. However, commencing in June, 1989 payments we relate and by August 1989 Double RS started to fall behind. From time to time the parties orally agreed to change orders for which PDS billed Double RS. Although the contract required change orders be in writing, there is no dispute the work was done. PDS stopped work in January 1990 because Double RS stopped paying PDS invoices.
PDS filed its mechanic's lien certificate in the town clerk's offices of Wethersfield and Newington on January 31, 1990, claiming to be owed $215,497.15 for work performed and materials furnished "commencing March 27, 1989 and ending January 15, 1990."
Connecticut's mechanic's lien statute, 49-33 et seq. at 49-33(b) provides that a mechanic's lien "takes precedence over any other encumbrance originating after the commencement of the services, . . ." PDS claims it started work on the strip plaza by way of architectural and engineering services in November 1988 and physical labor on the site itself in March 1989, and since these services were commenced before April 13, 1989 when the United Bank mortgage was recorded, PDS's mechanic's lien has precedence over the mortgage.
United Bank, on the other hand, contends: (1) PDS work done before Double RS took title to the property and/or before the contract was signed is not lienable; (2) off-site CT Page 10309 engineering work and the minimal work done by PDS before recording of United Bank's mortgage do not amount to "commencement of services" within the meaning of 49-33 (b); (3) PDS's conduct prior to the placing of United Bank's mortgage estops it from claiming priority over the mortgage; (4) PDS has failed to prove the amount of its lien; (5) the Connecticut mechanic's lien statute, as applied to the facts of this case, is unconstitutional in light of the recent United States Supreme Court case of Connecticut v. Doehr, 501 U.S. 1, 115 L.Ed.2d 1, (1991).
This court determines that United Bank cannot prevail in its first four defenses but concludes that United Bank can prevail on its defense that the mechanic's lien law would unconstitutionally deny United Bank due process of law were it applied to give PDS's lien priority over United Bank's mortgage.
 1. The issue of the lienability of PDS work done before defendant Double RS acquired title on March 9, 1989 and before the contract was signed between PDS and defendant Double RS on March 27, 1989
United Bank contends work done by plaintiff PDS before Double RS acquired title to the subject property on March 9, 1979 is not lienable. In Bridgeport People's Savings Bank v. Palaia, 115 Conn. 357 (1932) materials were furnished and labor performed before and after the defendant took title to the property and simultaneously executed a mortgage to the plaintiff bank. The court held a mechanic's lien did not attach for the materials and labor provided before title vested in defendant, and the plaintiff bank's mortgage took precedence over the lien for materials and labor provided after the mortgage was recorded. See also Middletown Savings Bank v. Fellowes, 42 Conn. 36 (1875).
However, in this case the critical fact is plaintiff PDS furnished materials and performed labor after Double RS took title to the property on March 9, 1989 and before defendant United Bank recorded its mortgage on the property on April 13, 1989. Those acts are sufficient to establish the precedence of PDS' mechanic's lien, under 49-33(b) so that whether or not work was done before March 9, 1989 is irrelevant.
Moreover, the services and materials provided by PDS were paid for as its work progressed, at least up to August 1989. Thus, the court can infer that PDS invoices CT Page 10310 prior to March 9, 1989 are not a part of the debt PDS is now claiming to be due and owing.
United Bank also contends work done by PDS before March 27, 1989, when the contract between PDS and Double RS was signed, is not lienable. Section 49-33 (a) provides that a mechanic's lien for materials furnished and labor rendered arises when the claim is "by virtue of an agreement with or by consent of the owner of the land." There is no requirement the agreement between owner and contractor be in writing. Here the evidence is, and the court finds, Double RS consented to PDS performing services relating to the project in October 1988. For purposes of lienability, the date the contract was signed on March 27, 1989 is irrelevant.
2. The issue of commencement of services
Section 49-33 (b) provides that a mechanic's lien "takes precedence over any other encumbrances originating after the commencement of the services or the furnishing of any such materials, . . . ." United Bank contends that plaintiff's mechanic's lien should not take precedence over its mortgage because PDS' off-site engineering services and its minor preparatory work on the property done prior to April 13, 1989, when the United Bank mortgage was recorded, do not constitute the "commencement" of services or furnishing of materials within the meaning of 49-33(b).
The facts found by this court are that PDS began preparing revised architectural plans and engineering drawings as early as November 1988 and continued until October 2, 1989, the date on the final revision of the plans used for the building.
There is a sharp conflict among the states on whether or not preliminary plans and drawings of architects and engineers, before visible work is done on the site, constitute commencement of services within the meaning of a state's mechanic's lien statute. Cases holding that such non-visible work does not amount to commencement of services, so as to trigger relating back the priority of a mechanic's lien to the date work first started, are: Williams and Works, Inc. v. Springfield Corp., 293 N.W.2d 304, 313 (Mich. 1980), Tripp v. Vaughn, 747 P.2d 1051, 1053 (Utah App. 1987), Aladdin Heating v. Trustees of Central States, 563 P.2d 82,84-85 (Nev. 1977).
Cases holding that architects `and engineers' preliminary plans and drawings do constitute commencement of work within the meaning of a state's mechanic's lien law CT Page 10311 are: Bankers Trust Co. v. El Paso Pre-Cast Co., 560 P.2d 457,461 (Col. 1977) (". . . an architect's lien related back to the commencement of his work upon the plans and drawings." (p. 461)); Sheldon v. Platte Valley Savings, 794 P.2d 1083
(Col. 1990) (work performed by architects for financing information, projection of finish for a prospective tenant are lienable); Stern v. Great Plains Federal Savings Loan Assn., 778 P.2d 933 (Okla. 1989) (architect's services in preparing plans and specifications used in work done on the land are lienable claims); Design Associates Inc. v. Powers,356 S.E.2d 819 (N.C. 1987) (architect entitled to lien for professional design services even if his work did not improve the property). To the same effect are Korsunsky Krank Ericson Architects, Inc. v. Walsh, 370 N.W.2d 29 (Minn. 1985); Johnson v. Barnhill 306 S.E.2d 216 (S.C. 1983).
The disparity in the holding of these two groups of cases can in large part be explained by differences in the wording of state mechanic's lien statutes.
The only Supreme Court case in Connecticut is Marchetti v. Sleeper, 100 Conn. 339 (1924). It clearly holds that "services of an architect in the preparation of plans and specifications, when they are afterwards used in the construction of a building, are services rendered in its construction, for which the architect is entitled to a lien under our statute," (at 343) (underlining added).
Since in this case, PDS' architectural and engineering services were used in the construction of the building on the land subject to the mechanic's lien, the court concludes that under Connecticut law its lien fixed at least on March 9, 1989 when Double RS took title to the property, which was well prior to the date of United Bank's mortgage. This conclusion, however, is not critical to this court's decision because the court finds PDS did physical work on the site before United Bank's mortgage was recorded.
United Bank also contends the minimal work done by PDS on the project before April 13, 1989 did not amount to commencement of services and furnishing of materials rendered in the construction of the building, within the meaning of49-33(a) and 33(b).
The facts are that between March 9 and April 13, 1979 PDS hired subcontractors who did the following work on the building site: established building corners, laid out storm drain lines and catch basins, cut brush, flagged trees for removal, made test borings and soil tests, delivered and spread fill with excavation equipment, and installed a CT Page 10312 silt fence.
Only two old Connecticut cases deal with the meaning of commencement of services under the mechanic's lien law: Middletown Savings Bank v. Fellowes, 42 Conn. 36 (1875) holds that work done on repairing a fence enclosing a lot prior to a mortgage being placed on the lot did not amount to the commencement of services so as to require that a mechanic's lien for that work took precedence over the mortgage; Hillhouse v. Duca, 101 Conn. 92 (1924) holds that cutting and removing pipes from a house located on one lot before the house was moved to another lot did not amount to commencement of services on a new building begun on the first lot six months afterwards, so as to form the basis for a mechanic's lien on the new building.
The cases of other states conflict as to what constitutes commencement of construction for purposes of determining the accrual of mechanics' liens. See 1 A.L.R.3rd 822 (1965). The courts are not bound by any strict rules but have examined all the circumstances to satisfy themselves that it is apparent from the work done that the construction of the building is underway. Id. at 825. Thus, in Diversified Mortgage Investors v. Gepada, Inc., 401 F. Sup. 672
(S.D. Iowa, 1975) mowing weeds, checking elevations and removing of top soil was held not to constitute commencement of services. In Woolridge Constr. Co. v. First Nat'l. Bank, 634 P.2d 13
(Ariz.App. 1978) earthwork and site preparation performed pursuant to the overall building construction contract did constitute sufficient commencement of services to establish the priority of a mechanic's lien.
Both of these cases and other well-reasoned opinions recognize that "commencement of services" is a term of art keyed to notice being given to persons coming on the property that the work already done sufficiently indicates that construction is going forward. Woolridge Constr. Co. v. First Nat'l. Bank, supra at 19; Diversified Mortgage Investors v. Gepada, supra at 685.
In this case this court concludes the physical work done by PDS on the site prior to April 13, 1989 was sufficient to give adequate notice to United Bank that the construction of a building was underway. Consequently PDS' mechanic's lien antedates United Bank's mortgage.
3. The issue of equitable estoppel
United Bank asserts PDS should be equitably estopped from asserting the priority of its mechanic's lien over the CT Page 10313 bank mortgage because of its failure to disclose the work it had done prior to the mortgage closing. The facts are as follows: Attorney Jacek Smigelski, counsel for United Bank, called Frank Borawski, president of PDS several days before the closing, saying he needed from PDS a collateral assignment of its contract with Double RS and a list of subcontractors. He did not specifically ask whether any work had been done up to then. Borawski replied he would sign the collateral assignment, get Smigelski a list of the subs, and added that no bills would be presented at the closing. This conversation was repeated on the day of the closing. Smigelski had at that time in the bank mortgage file the Newington and Wethersfield building permits and a copy of the contract between PDS and Double RS which provided work would start when building permits were issued. Smigelski never asked Borawski to sign a lien waiver and Borawski never indicated he would not sign one.
The two essential elements of equitable estoppel are "that one party must do or say something which is intended or calculated to induce another to believe in the existence of certain facts and to act in that belief, and that the other party, influenced thereby, must change his position or do some act to his inquiry which he otherwise would not have done." Bozzi v. Bozzi, 177 Conn. 232, 242 (1979).
The court finds Attorney Smigelski failed to ask Borawski the right questions: whether or not work had been done on the site and if so, was it going to be the basis of a mechanic's lien? More significantly, United Bank admitted, by its response to request for admissions, that it had a belief that labor had been done prior to the recording of its mortgage, so even if Borawski lacked candor in his conversation with Smigelski, United Bank did not rely on his answers.
Another ingredient of equitable estoppel is that the person claiming estopped "must show that he has exercised due diligence to know the truth and that he not only did not know the true state of things but also lacked any reasonably available means of acquiring knowledge." State v. American News Co., 152 Conn. 101, 114 (1964); Eighth Utilities District v. Manchester, 176 Conn. 43, 53
(1978).
Here, United Bank had in the file the building permits dated March 9, 1989 and contract between PDS and Double RS providing that work was to start when the permits were issued. It also had the opportunity to send a representative to the site to see the work then underway, which should have alerted CT Page 10314 it to make further inquiry of Double RS. On balance, this court finds United Bank did not exercise due diligence to discover the true situation. Thus, the defense of equitable estoppel is without merit.
4. The issue of the amount of the lien
PDS produced evidence at the trial that it was owed $215,497 for work done on the contract plus interest, per the contract, of $38,375, making the total $253,872 as of January 24, 1991.
United Bank challenges the amount on two grounds: (1) since the building was not completed, a deduction should be made for the cost of completion, and (2) much of the balance claimed to be due is based on work done on change orders which were not approved in writing by the owners, as required by the contract.
Connecticut law is that a contractor suing for the contract price, when he has not completed the building, should have deducted the cost of having the work comply with the contract. Daly Sons v. New Haven Motel Co., 91 Conn. 280,288 (1917); Bruni v. Behnke, 144 Conn. 181, 182-83 (1956).
At trial PDS' appraiser testified it would cost $235,000 to complete the building. However, he did not base that estimate on an actual review of plans and specifications. The court finds it unreliable. Better evidence is the credit of $58,941 given by PDS to Double RS for certain unfinished items under the plans and specifications. This credit does make the proper allowance for the uncompleted work.
While the contract between PDS and Double RS required that changes in the work "shall be authorized by written Change Orders signed by the Owner," the evidence is clear that a representative of PDS orally approved the change orders and the work was in fact done. Our law is that even when a written contract provides "that it may not be changed except in writing, a parol agreement modifying its terms will be given effect." Blakeslee v. Water Commissioners, 121 Conn. 163,183-184 (1936); Brian Construction Development Co. v. Brighenti, 176 Conn. 162, 169-70 (1978).
Thus, the court concludes the work done by PDS on the oral change orders can be included in the amount due PDS on its mechanic's lien, which the court finds to be $253,872 as of January 24, 1991.
5. The constitutional issue CT Page 10315
Having resolved all the issues relating to the validity of the mechanic's lien in favor of PDS, this court must, finally, turn to the constitutional defense raised by United Bank.
This court starts its inquiry of the constitutionality of the statute with Roundhouse Construction Corporation v. Telesco Masons Supplies Co., 168 Conn. 371 (1975), vacated423 U.S. 809; aff'd 170 Conn. 155 (1976); cert. denied 429 U.S. 889. In that case the Connecticut Supreme Court held that the statute as it existed in 1974 failed to meet state and federal due process requirements on the grounds that: (1) the filing of the mechanic's lien severely restricted the property owners' opportunity for and possibility of alienation of the real property, thus depriving him of a significant property interest; (2) the filing and perfecting of the lien could be done ex parte; without authorization, supervision or control by a judicial officer, (3) the sworn certificate of lien required to be filed was a "conclusory statement, totally devoid of any substantive underlying facts", (4) most significantly, lacking "is any provision whatsoever for any sort of a timely hearing, either before or after the recording of the lien, which would give the property owner an opportunity to be heard or require the lienor to justify his lien." (168 Conn. at 383).
The General Assembly immediately acted to correct some of the constitutional infirmities of the statute.Public Act 75-418 provided, inter alia, that the lienor must serve a copy of the mechanic's lien upon the owner, (49-34); and when a mechanic's lien is recorded upon real estate, the owner may make application for a hearing to determine whether the lien should be discharged or reduced (49-35a).
In June 1991 the United States Supreme Court decided Connecticut v. Doehr, 501 U.S. — 115 L.Ed.2d 1. That case involved a claim that an ex parte pre judgment attachment granted by a Connecticut court on defendant's real estate in an assault and battery action violated the procedural due process requirements of the Fourteenth Amendment. The court noted that "`[d]ue process unlike some legal rules is not a technical conception with fixed content unrelated to time, place and encumbrances'" id. 115 L.Ed.2d at 13). Relying on Matthews v. Elderidge, 424 U.S. 319, it sets forth a three-fold inquiry to determine whether or not due process has been denied: consideration of (1) "the private interest affected" by the ex parte attachment; (2) "the risk of an erroneous deprivation of such interest through the procedures used, . . .", and (3) "principal attention to the interest of the party CT Page 10316 making the pre judgment remedy, . . . ." Doehr, supra,115 L.Ed.2d at 15). The court concluded: (1) the property interest of owners that attachments affects is significant because attachments cloud title, impair the ability to sell the property, taint credit rating, reduce the chances of another mortgage on the property, and even place an existing mortgage in technical default (2) the risk of erroneous deprivation of that property interest is high because under Connecticut procedure, an ex parte real estate attachment is granted by a court finding probable cause after examining only the self-serving, conclusory affidavits of one side to the case and this risk is particularly high when the action involves a fact-specific event like an assault; and (3) the plaintiff has no pre-existing interest in the defendant's property, his only purpose for seeking the attachment being to ensure payment of an ultimate judgment if he prevails. The court concluded that "the Connecticut provision before us, by failing to provide a pre-attachment hearing, without at least requiring a showing of some exigent circumstances, clearly falls short of the demands of due process." (Id., 115 L.Ed. at 17). On the basis of that case, defendant United Bank challenges the constitutionality of the existing mechanic's lien statute. Before undertaking the three-fold inquiry required by Doehr it is essential to emphasize the identity of the contestants. The defendant Double RS, the property owner, has been defaulted and makes no attack upon the mechanic's lien statute. The attack is being made by United Bank, and the constitutional issue must be resolved in light of its mortgagee status and its mortgage interest.
a. The property interest affected
There is a sharp conflict in courts throughout the country as to the adverse consequences to the property owner of the filing of a mechanic's lien on the land records. In the leading case of Spielman-Fond, Inc. v. Hanson's, Inc.379 F. Sup. 997 (Ariz. 1973), aff'd 417 U.S. 901 (1974) a three-judge federal district court held that a mechanic's lien statute which allows a lien to be placed on the land records without a prior hearing is not violative of due process under the Fourteenth Amendment because the lien does not amount to a taking of a significant property interest. The court noted that while the lien clouds title, it does not prevent the property owner from selling and "difficulties the lien creates may be ameliorated through the use of bonding or title insurance." (id. p. 999).
Spielman-Fond was summarily affirmed by the United States Supreme Court at 417 U.S. 901 (1974). As a result of that affirmance, lower federal courts throughout the CT Page 10317 country felt compelled to follow Spielman-Fond and to uphold the constitutionality of state mechanic's lien laws: B P Development v. Wicker, 420 F. Sup. 704 (W.D. Pa. 1976) upholding Pennsylvania law; In re Thomas A. Carey, Inc.,412 F. Sup. 667 (E.D. Va. 1976) upholding Virginia law; Brook Hollow Associates v. J.E. Greene, Inc., 389 F. Sup. 1322 (D Conn. 1975) upholding Connecticut law; In re The Oronoke,393 F. Sup. 1311 (Me, 1975) upholding the Maine law. State mechanic's lien laws were upheld on the grounds the deprivation to property owner was de minimis and without reliance on Spielman-Fond, in Cook v. Carlson, 364 F. Sup. 24 (S.D., 1973) and Ruocco v. Brinker, 386 F. Sup. 432 (S.D. Fla. 1974).
The Connecticut Supreme Court in Roundhouse. supra, found a significant deprivation from the fact "the recording of a mechanic's lien, while it does not prevent alienation of the property, does, as a practical matter, severely restrict the opportunity for and possibility of its alienation." To the same effect is Barry Properties, Inc. v. Fiola Bros. Roofing Co., 353 A.2d 222 (Md. 1976).
In Doehr, at footnote 4 (115 L.Ed. at 14) the United States casts considerable cloud on the significance of its summary affirmance of Spielman-Fond by stating it "does not control", at least as to the lower court's finding that filing of a mechanic's lien did not amount to the taking of a significant property interest.
However, this court is not concerned with the impact of the filing of the mechanic's lien on the interest of the property owner, Double RS, but on the interest of the mortgagee United Bank. There is no question United Bank has an interest in the property subject to the mechanic's lien equal to its mortgage on that property in the original amount of $1,750,000. At trial the property was appraised for $1,150,000, so the bank's mortgage, with accrued interest and costs of foreclosure, substantially exceeds the value of the property. There is no question if the mechanic's lien of plaintiff PDS in the amount of $215,497.15, plus interest, costs and attorney's fees, is found in this proceedings to have priority over United Bank's mortgage, United Bank will be adversely affected precisely by that amount.
The question is whether the filing of the mechanic's lien, in and of itself, deprives United Bank of any property interest. The filing does not have the affect on United Bank it can have on a property owner: reduce the chances of a second mortgage, taint credit rating, place an existing mortgage in technical default. It does, however, have one consequence: the lien, by claiming priority over United Bank's CT Page 10318 mortgage, casts a cloud on the status of the mortgage as a first lien and reduces the prospect of United Bank selling its mortgage. The court can take judicial notice of the commercial practice of banks assigning mortgages among themselves or selling mortgages in a secondary market to adjust portfolios and to meet liquidity demands. In Roundhouse our Supreme Court held that a restriction on "the opportunity for and the possibility of [property] alienation" amounts to a significant taking. Roundhouse, supra p. 384. Thus, this court finds the impact of recording the mechanic's lien on United Bank is significant and it must be weighed against the other Doehr factors in determining the issue of denial of due process here presented.
b. The risk of erroneous deprivation of property
As indicated above, in Roundhouse our Supreme Court held the procedures for filing a mechanic's lien under the 1974 law were constitutionally inadequate to sustain the validity of the lien.
The 1975 legislature let stand the procedures that: (1) the claimant can file the lien ex parte without authorization or control by a judicial officer, (2) the sworn certificate is required to contain only conclusory statements as to when the work commenced and the amount claimed to be justly due, without any substantive, underlying facts. But it amended the law to require that the lienor notify the owner of the real property when recording the lien (49-34) and give to the owner, after the tiling of the lien, the right to apply for a hearing before a judge to have determined whether the lien should be discharged or reduced (49-35a).
No direct challenge has since been made to the constitutionality of the statute as amended. (But see General Electric Supply Co. v. SNETCO, 185 Conn. 583, 591
(1981)). The provisions of the 1975 amendment giving to an owner the right to notice and to an opportunity for a prompt hearing to contest the amount and the validity of the mechanic's lien seem to have quieted the constitutional waters.
The question here is whether United Bank, as a mortgagee, has the rights of an "owner" within the meaning of49-34 and 49-35a. "In Connecticut a mortgagee has legal title to the mortgaged property and the mortgagor has equitable title, also called the equity of redemption." Barclay Bank of New York v. Ivler, 20 Conn. App. 163, 166
(1989). But the mortgagee is "regarded as having legal title to the land only to a limited extent and for a limited purpose . . . . He has title and ownership enough to make his security CT Page 10319 available, but for substantially all other purposes, he is not regarded as the owner, but the mortgagor is so regarded, always subject of course to the mortgage." McKelvey v. Creeney,72 Conn. 464, 467, 468 (1900).
This legalistic concept of legal and equitable title is applied only as between mortgagor and mortgagee. Thus, in Barclay Bank of New York v. Ivler, supra, the court held that after the law day had passed, the mortgagor's equity of redemption was extinguished and title vested absolutely in the mortgagee.
But the legal title in the mortgagee does not make the mortgagee an owner in any other context. In State v. Stonybrook, Inc., 149 Conn. 492 (1962), for example, the federal government sold a housing development to a private corporation, taking back a purchase money mortgage. When the corporation was cited for municipal housing code violation, it contended legal title to the development vested in the federal government by virtue of the mortgage and the government was exempt from compliance with the code. The court held: "Obviously, such technical legal title as the government has, as mortgagee, is not the equivalent of legal title in the sense in which the term would be used were the government to be treated as the present owner or operator of the property. . . . The government is not the owner of the property, nor does it have legal title thereto in such a manner as to give the defendant immunity from compliance with the Stratford building code." 149 Conn. at 996.
The legislative history of the 1975 amendment to the mechanic's lien law is silent on the meaning of "owner" as used in 49-34 and 35a. (18 H.R. Proc., PT. 10, 1975 Sess., p. 4922). This court concludes that if the legislature intended "owner" to include mortgagee, it would have more explicitly said so and not relied upon the artificial legal construct of legal title in the mortgagee, vis-a-vis the mortgagee-mortgagor relationship.
Thus, this court concludes United Bank is not an owner of the subject property within the meaning of 49-34 and 35a. (To the contrary is Red Rooster Construction Co. v. River Associates, Inc., 4 Conn. L. Rptr. No. 10, p. 315, (July 22, 1991)).
The consequence is that United Bank was not entitled to notice of the filing of plaintiff's mechanic's lien pursuant to 49-34 and to a prompt hearing to reduce or discharge the lien, pursuant to 49-35a. Notice of filing of PDS' lien on January 31, 1990 was not, in fact, given to United Bank. CT Page 10320
In General Electric Supply Co. v. SNETCO, 185 Conn. 583
(1981) in which a general contractor sought to contest a subcontractor's mechanic's lien, the court, noting that the subcontractor had a year, under 49-39, to start a foreclosure action, and that the general contractor could only obtain a hearing under 49-37 (a) after posting bond, stated, by way of dicta, that "defendants have made out a strong prima facie case that our statute may operate to deprive a general contractor of a prompt hearing. . . . Roundhouse Construction Corporation v. Telesco Masons Supplier Co., supra, 380-81, 383." 175 Conn. at 592.
Roundhouse is, in fact, directly on point as it applies to United Bank in this case. In Roundhouse the court held that when the owner of property subject to a mechanic's lien did not have a right to a timely hearing, before or after the recording of the lien, to require the lienor to justify the lien, there was an unconstitutional deprivation of due process under the state and United States constitutions. Here United Bank does not have that right.
PDS points to language in Doehr to the effect that when a debtor-creditor relationship exists and the debt can be established by documentary proof, there is less constitutional necessity for a hearing. 115 L.Ed. 15. But in Connecticut the mechanic's lien certificate need only state the amount of the debt and that it is justly due, without further documentary proof.
Thus, this court is obligated to follow the holding of Roundhouse, and hold that the statute cannot constitutionally operate to give PDS' lien priority over United Bank's mortgage, unless the heightened property interest PDS has as a mechanic's lienor tips the constitutional scale in its favor.
c. The interest of the mechanic's lienor
The interest of the mechanic's lienor in the property is based on the services rendered and materials furnished in the construction of the building on the property. The contractor is vulnerable to subsequent encumbrances from the time he commences his work. Strong public policy justifies affording him the protection of a lien on the property, the value of which he enhances. Cook v. Carlson, 364 F. Sup. 24, 27, 29 (S.D. 1973).
There is a sharp distinction between the property interest of plaintiff PDS here and the plaintiff in Doehr. The Doehr plaintiff had no existing interest in the defendant's CT Page 10321 real estate when he sought the attachment. His interest in the property was to ensure the availability of an asset to pay his judgment if he prevailed in the action. PDS, on the other hand, by constructing the building, added directly to the value of the property.
The Doehr court recognized the significance of this distinction. In footnote 4, after stating that its summary affirmance of Spielman-Fond (which upheld the constitutionality of the Arizona mechanic's lien law) was not entitled to full precedential value, it went on: "The facts of Spielman-Fond presented an alternative basis for affirmance in any event. Unlike the case before us, the mechanic's lien statute in Spielman-Fond required the creditor to have a preexisting interest in the property at issue. As we explain below, a heightened plaintiff interest in certain circumstances can provide a ground for upholding procedures which are otherwise suspect." 115 L.Ed.2d at 14.
The concurring opinion of Justices Renquist and Blackmun picked up on that theme. It notes that workers who contribute their labor and material men who furnish materials to improve the property, cannot reclaim either their labor nor materials once it has become a part of the realty, and the mechanic's lien is the only remedy they have against property owners. The concurring opinion adds, "To require any sort of contested court hearing or bond before the notice of the lien takes effect would largely defeat the purpose of these statutes." 115 L.Ed.2d at 24.
These comments of the Justices of the United States Supreme Court imply that there may be no necessity for a hearing before filing a mechanic's lien. This court need not decide that issue because here PDS has no right to a timely hearing even after the mechanic's lien filing. And in Roundhouse our Supreme Court found a denial of due process when there was not a right to a prompt hearing either before or after the recording of the lien.
Moreover, our Supreme Court in Roundhouse took into account the remedial intent of the mechanic's lien law (168 Conn. at page 385) and still found that the high interest in protecting such lienor's right could not supersede the constitutional right to a hearing at a meaningful time and in a meaningful manner by those affected by the lien.
Thus, this court concludes that the mechanic's lien law, to the extent that it were to operate to give priority of PDS' lien over United Bank's mortgage would violate the due process clause of the Fourteenth Amendment of the United States CT Page 10322 constitution and Article First 10 of the Connecticut constitution. Accordingly, the PDS lien is determined to be secondary in priority to the United Bank mortgage.
A judgment of strict foreclosure may enter in favor of PDS; its debt is fixed at $253,872, plus interest accruing from January 24, 1991 to date. PPS is awarded attorney's fees in the amount of $20,000 and an appraisal fee of $4800. The law day is set as February 24, 1992 for Double RS, the owner of the equity of redemption, and subsequent dates for subsequent encumbrancers in inverse order of their priority. The order of priorities of encumbrances on the property is as follows:
 1. United Bank and Trust Co., a/k/a Fleet Bank
2. PDS Engineering and Construction, Inc.
 3. Eastern Sewer Pipe Corporation, d/b/a EPPCO
4. G R Valley, Inc.
 5. Ronald Guimond, d/b/a Guimond Wallpaper and Paint.
ROBERT SATTER STATE TRIAL REFEREE